# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| United States of America for the Use and Benefit of WFI Georgia, Inc. and Capital Computer Group, LLC | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:07-cv-02445-JOF |
| v. | : : | |
| The Gray Insurance Company, et al., | : : | |
| Defendants. | : | |

## OPINION & ORDER

This matter is before the court on Plaintiff Kratos Southeast Inc.'s[1] motion for summary judgment [113]; Defendant Gray Insurance Co.'s motion for summary judgment [117]; Plaintiff Capital Computer Group, LLC's motion for summary judgment [126]; Plaintiff Capital Computer Group, LLC's motion to strike or disregard [130]; Defendant Gray Insurance Co.'s motion to vacate [135]; Defendant Gray Insurance Co.'s motion to supplement [152]; Defendant Gray Insurance Co.'s second motion to supplement [154]; Third-Party Defendant Joseph Terry's motion to dismiss [162]; and Third-Party Defendants Aaron and Tammie Terry's motion to dismiss [167].

## I.     Factual and Procedural Background

---

[1] Plaintiff Kratos Southeast Inc. was formerly known as WFI Georgia, Inc.

The instant action is a surety matter under the Miller Act, 40 U.S.C. § 3133. In September of 2005, the Centers for Disease Control and Prevention (CDC) entered into a contract with Defendant Government Technical Services, LLC (GTS'), under which GTS was to furnish labor and materials and perform the work required for construction of a BAS/LAN Fire Alarm System on the CDC's Atlanta campus. Under the Miller Act, a contractor working on government property is required to execute a payment bond, and Defendant Gray Insurance Co. ("Gray") acted as GTS' surety on the project. GTS, as the general contractor, hired Plaintiff Kratos Southeast, Inc. (Kratos) as a subcontractor to perform part of the necessary work on the fire alarm system. At the end of 2007, the Kratos and GTS relationship ended. Subsequently Plaintiff Capital Computer Group, LLC (CCG) and Code 4 Systems, Inc. (Code 4), a nonparty, became involved in finishing the work started by Kratos.[2] CCG and Code 4 stopped any involvement with the CDC project after non-payment by GTS. GTS was terminated by the CDC on February 27, 2009. D.E. [113], Ex. E, at 28.

On October 3, 2007, Kratos sued both GTS and Gray under the Miller Act, alleging that Kratos had performed under its contract with GTS but was not compensated. Defendants Gray and GTS counterclaimed, alleging that Kratos failed to timely complete

---

[2] Some of the parties dispute the capacity in which CCG became involved in the CDC project. CCG argues that it was a subcontractor of GTS. Gray argues that CCG was merely the creditor for Code 4, and Code 4 was actually the subcontractor.

2

cable installations in a workmanlike manner and, therefore, breached the agreement. On July 16, 2008, CCG also sued GTS and Gray, alleging that it had not been paid for the work it performed on the alarm system after Kratos was terminated. This court consolidated Kratos and CCG's cases against GTS and Gray on October 14, 2008. In December of 2008, Kratos and GTS arbitrated Kratos' claim against GTS, and Kratos received a favorable arbitration award. GTS filed a third-party complaint against Joseph, Aaron, and Tammie Terry.[3] Kratos filed a motion for summary judgment against Gray on March 19, 2009.[4] Gray filed a motion for summary judgment against CCG on March 19, 2009, and CCG filed a cross-motion for summary judgment against both Gray and GTS on April 2, 2009.[5] A few days later, CCG also filed a motion to strike or to disregard some of the exhibits relied upon by Gray in its motion for summary judgment. On April 13, 2009, Gray moved to vacate the arbitration award received by Kratos. Finally, Joseph, Aaron, and Tammie Terry filed motions to dismiss for lack of personal jurisdiction in June and July of 2009 respectively.

---

[3] Joseph Terry is the owner and president of GTS. Aaron Terry is the chief executive officer of GTS. Tammie Terry is Aaron Terry's wife.

[4] On June 3, 2009, Gray filed a motion to supplement its response to Kratos's summary judgment motion.

[5] Gray filed a motion to supplement its response to CCG's motion for summary judgment on June 3, 2009.

AO 72A
(Rev.8/82)

## II.     Motion for Summary Judgment [113] and Motion to Supplement [154]

This court must first consider Gray's motion to supplement its response brief [154] before addressing the relevant facts and merits of Kratos' motion for summary judgment [113].  Under this court's Local Rules, a party moving for summary judgment must include a statement of material facts with its motion. L.R. N.D. Ga. 56.1.B(1). The respondent, along with its responsive brief, needs to file a response to the movant's statement of undisputed facts. L.R. N.D. Ga. 56.1B(2)a. That response "shall contain individually numbered, concise, non-argumentative responses corresponding to each of the movant's numbered undisputed material facts." L.R. N.D. Ga. 56.1B(2)a(1). If this is not done, the court deems each of the movant's facts admitted. L.R. N.D. Ga. 56.1B(2)a(2). Kratos provided the court with its required statement of material, undisputed facts. While the respondent, Gray, offered its own statement of additional facts which it contends are material and present a genuine issue for trial, it did not respond to Kratos' material statement of facts.

In its reply brief filed on April 27, 2009, Kratos noted that Gray failed to comply with the Local Rules. Gray subsequently filed this June 3, 2009 motion to supplement its response brief, contending that its response brief and attached statement of material facts and exhibits directly and sufficiently refute Kratos' factual allegations."[I]n an abundance of caution," however, Gray desires to supplement the record to include its response to Kratos' statement of material facts. Kratos argues that Gray should not be allowed to supplement and

4

should be deemed to have admitted the facts in Kratos' statement of material facts because (1) Gray has not provided evidence of "excusable neglect" and (2) Gray did not attempt to supplement until well after the summary judgment period closed—over a month after Kratos pointed out Gray's failure to comply with L.R. 56.1.

Under L.R. 56.1A, "parties shall not be permitted to file supplemental briefs and materials . . . except upon order of the court." Local Rule 56.1 exists to allow courts to determine quickly whether there are any facts upon which both parties agree, and, if so, whether judgment as a matter of law is appropriate. While Gray has offered no reason for its failure to comply with the local rules, Gray is correct that its own statement of material facts, which cites to evidence as required by the rules, disputes many of Kratos' fact statements. Additionally, even "after deeming the movant's statement of undisputed facts to be admitted pursuant to Local Rule 56.1, the district court must [still] review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (internal quotations omitted). Accordingly, the court finds that it would be advantageous to the decision-making process if the court permits Gray to supplement. Further, Kratos does not contend that it would be prejudiced if Gray is allowed to supplement. Therefore, Gray's motion to supplement is GRANTED [154].

AO 72A
(Rev.8/82)

GTS and the CDC entered into a written contract in September of 2005, whereby GTS would act as the general contractor in charge of installing a BAS/LAN Fire Alarm System Integration at the CDC's Atlanta campus. In order for GTS to comply with the Miller Act, Gray issued a payment bond for the amount of $1,640,275.00. Kratos Complaint, Ex. A; Gray Answer, at ¶ 7. GTS hired Kratos as a subcontractor in December of 2005 to work on parts of the fire alarm system, including installation of a fiber optic network. D.E. [113], Ex. A. Kratos and GTS ended their relationship in 2007. GTS was later terminated by the CDC. D.E. [113], Ex. E, at 28. Kratos filed suit against GTS and Gray on October 3, 2007, alleging that it was owed money under its agreement with GTS, and that Gray was liable as GTS' surety.

The contract between GTS and Kratos contained an arbitration clause, requiring GTS and Kratos to arbitrate any controversy or claim relating to the subcontract. D.E. [113], Ex. A, at 12, ¶ 6.1. As early as 2008, Gray's former attorney, Ramsey Duck, was aware of Kratos' intent or desire to arbitrate. D.E. [133-8], at 2-3. In March of 2008, Gray's current attorney, Aldos Vance, sent an email to Kratos' attorney, Deborah Butera, with a revised discovery plan attached. D.E. [113], Ex. E, at 27. The unrevised edition indicated that Gray, Kratos, and GTS would be participating in arbitration. *See id*. at 20. The plan, as revised by Gray, stated that only Kratos and GTS would participate. *Id*. Ms. Butera responded that she was under the impression Gray would also take part, based on a prior conversation she had

AO 72A
(Rev.8/82)

with Ramsey Duck. *Id.* at 12. In reply, Mr. Vance said that he would get back to her at a later date regarding Gray's participation in the arbitration. *Id.* On May 8, 2008, Kratos filed a Demand for Arbitration between it and GTS with the American Arbitration Association ("AAA"). *See* D.E. [113], Ex. E, at 9. A copy of the demand was sent to Gray, although the demand was filed against GTS only. *Id.*

The AAA issued a notice of arbitration on May 22, 2008, and on June 5, 2008, GTS filed a motion to stay the pending arbitration proceedings.[6] D.E. [45]. Both Gray and Kratos filed responses opposing GTS' motion to stay. D.E. [47], [50]. In September of 2008, Kratos' attorney sent an email to Gray reminding Gray that its participation in the arbitration was desired. D.E. [113], Ex. E, at 10. The email stated the following:

> As you are aware, I have repeatedly invited and encouraged Gray to participate in the arbitration of Kratos' claims. Gray has consistently declined to participate. . . . Gray is welcome to participate in the arbitration. The process to do so is very easy and straightforward. Gray must simply consent to the arbitration in writing and agree to be bound by its outcome. The arbitrator was only recently appointed and the preliminary hearing has not been scheduled, so now is the ideal time for Gray to join the arbitration proceedings.

*Id.* In a motion filed with this court, Gray stated that it would not arbitrate until the court named it GTS' attorney-in-fact. D.E. [67], at 5 n. 6. Kratos never notified Gray of either the preliminary hearing date or the date of the arbitration.

---

[6]The court denied the motion as moot on March 27, 2009. D.E. [124].

The arbitration occurred on December 16, 2008, and neither GTS nor Gray were present at the proceedings. An award was issued on January 28, 2009 in favor of Kratos in the amount of $544,544.01. D.E. [113], Ex. D, at 13. This court confirmed that award on March 27, 2009. D.E. [124]. Kratos filed this motion for summary judgment arguing that the arbitration award against GTS also binds Gray, as the surety, because Gray had both knowledge of the arbitration proceedings and an opportunity to defend. Kratos further contends that Gray is bound by the arbitration award under the doctrines of *res judicata* and collateral estoppel. In return, Gray asserts that it did not have full notice of the arbitration, and further, under the Miller Act, even if Gray did have notice and an opportunity to defend, arbitration awards against the principal do not bind the surety.

Kratos brought suit under the Miller Act, 40 U.S.C. § 3131 *et seq.*, which provides for exclusive jurisdiction in the federal courts. *United States Fidelity and Guaranty Co. v. Hendry Corp.*, 391 F.2d 13, 18 (5th Cir. 1968).[7] The Miller Act requires general contractors on certain federal construction projects to get a payment bond. *F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., Inc.*, 417 U.S. 116, 121-22 (1974). Title 40 U.S.C. § 3133(b)(1) allows a civil suit by someone who furnished labor or materials while working on a project for which a Miller Act bond was issued if that person was not paid within ninety days of finishing the work. The person can recover on the bond for unpaid amounts due for

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

AO 72A
(Rev.8/82)

labor and materials furnished on the government project. The general rule regarding principals and sureties is that "a surety is bound by any judgment against its principal, default or otherwise, when the surety had full knowledge of the action against the principal and an opportunity to defend." *Drill South v. Int'l Fidelity Ins. Co.*, 234 F.3d 1232, 1235 (11th Cir. 2000). However, courts are not unanimous as to whether this rule binds sureties who provided a bond on a federal project, where the Miller Act the claimant has received an arbitration award against the principal based on non-payment, nor has the issue been addressed often.

Both the Sixth Circuit and the Ninth Circuit have held that arbitration awards against the principal can bind the Miller Act surety. The Sixth Circuit, relying on pre-1981 law from the Fifth Circuit, has held that an arbitration award against a principal is binding against its Miller Act surety where the surety had notice and the opportunity to defend. *United States ex rel. Skip Kirchdorfer, Inc. v. M.J. Kelley Corp.*, 995 F.2d 656, 662 (6th Cir. 1993). The Ninth Circuit held that an arbitration award against a principal, that was ratified by a state court, was binding on the Miller Act surety based on the Federal full faith and credit statute. *United States ex rel. Aurora Painting, Inc. v. Fireman's Fund Ins. Co.*, 832 F.2d 1150 (9th Cir. 1987). Several district courts have also either specifically held or indicated that arbitration awards would bind a surety. *See United States ex rel. Davis Contracting, L.P. v. B.E.N. Constr., Inc.*, 2007 WL 293915, at *6 (D. Kan. Jan. 26, 2007);

9

*United States ex rel. Frank M. Sheesley Co. v. St. Paul Fire and Marine Ins. Co.*, 239 F.R.D. 404, 418-19 (W.D. Pa. 2006); *United States ex rel. MPA Constr., Inc. v. XL Specialty Ins. Co.*, 349 F. Supp. 2d 934, 943 (D. Md. 2004). While no circuit has expressly held that arbitration awards do not bind Miller Act sureties, one district court has. *United States ex rel. Pensacola Constr. Co. v. St. Paul Fire and Marine Insurance Co.*, 705 F. Supp. 306 (W.D. La. 1989).[8] Also, one district court also indicated, but did not ultimately hold, that arbitration awards would not be binding on sureties. *United States ex rel. Frontier Constr.*, 262 F. Supp. 2d 893 (N.D. Ill. 2003).

The Eleventh Circuit has not addressed the specific question of whether an arbitration award against the principal also binds the surety when Miller Act claims are involved. The court finds *Drill South v. Int'l Fidelity Ins. Co.*, 234 F.3d 1232 (11th Cir. 2000), instructive. In *Drill South*, Enviro-Group, Inc. contracted with the United States government to do some construction work, obtaining the requisite Miller Act bond from defendant International Fidelity. 234 F.3d at 1234. Plaintiff Drill South entered into a subcontract with Enviro-Group. *Id*. Drill South then subcontracted some of the work it was to perform for Enviro-Group to Miller Drilling Co., Inc. *Id*. Enviro-Group defaulted on the contract, and Miller Drilling Co. sued Drill South, Enviro-Group, and International Fidelity under the Miller Act for unpaid invoices. *Id*. Drill South cross-claimed against International Fidelity and Enviro-Group. *Id*. During the course of litigation, Drill South moved for default against Enviro-

---

[8] The court in part relied on the decision in *Hendry Corp.*, 391 F.2d 13.

Group. *Id*. International Fidelity took no position on the default judgment, and Enviro-Group never responded. *Id*. The court entered default judgment against Enviro-Group. *Id*.

Later in the litigation, the district court decided that the default judgment against Enviro-Group also bound its surety, International Fidelity. *Drill South*, 234 F.3d at 1235. The district court, therefore, found the parties' pending cross motions for summary judgment moot, and entered a judgment against International Fidelity. *Id*. International Fidelity appealed, and the Eleventh Circuit affirmed the district court's decision, holding that "the general rule that a surety is bound by a judgment entered against its principal when the surety had both notice and opportunity to defend applies" to default judgments. *Id*. at 1237. International Fidelity had notice of the default judgment process and full knowledge that a default might be rendered against its principal. *Id*. at 1235-36. International Fidelity also had the legal right to step in and defend Enviro-Group because the contract between International Fidelity and Enviro-Group appointed International Fidelity as Enviro-Group's attorney-in-fact. *Id*. Therefore, International Fidelity had both notice and the opportunity to defend. *Id*. at 1236. "International Fidelity should not be permitted to stand back and allow a judgment to be taken setting the amount of recovery against its principal without similarly being bound by the judgment." *Id*. Under the same rationale, this court holds that Gray, as GTS' admitted surety, is bound by the arbitration award against GTS if Defendant Gray had both notice of the arbitration and an opportunity to defend.

11

Defendant Gray argues that *Hendry*, 391 F.2d 13, March 7, 2010 requires this court to hold otherwise. In *Hendry*, the Fifth Circuit held that under the Miller Act a surety was not bound by a state court judgment against the principal because the surety could not protect its rights as it could not intervene as a defendant in the state court proceeding. *Id.* at 18. The court also noted that "Congress vested exclusive jurisdiction over Miller Act suits in federal court," and, therefore, allowing a surety to be bound by a state court judgment "offends the congressional mandate" of exclusive jurisdiction. *Id.* The *Hendry* court noted that the general principle that sureties are bound by decisions rendered against their principles is "inapposite" in Miller Act cases. *Id.* at 17. First, unlike *Hendry*, this case pends in Federal court, was pending in this court at the time of the arbitration, and it was this court that confirmed the award. Furthermore, arbitration proceedings do not frustrate the congressional provision of exclusive jurisdiction to the federal courts. There is a "liberal federal policy favoring arbitrations,"[9] and in enacting the FAA, Congress gave federal courts the ability to confirm and/or vacate arbitration awards. There is still a federal forum for protecting sureties' rights. Additionally, courts have repeatedly held that an arbitration proceeding against the prime contractor is not inconsistent with a suit under the Miller Act. *See, e.g., United States ex rel. Portland Constr. Co. v. Weiss Pollution Control Corp.*, 532 F.2d 1009 (5th Cir. 1976). It makes little sense to allow a Miller Act claimant to pursue arbitration against the prime contractor to determine whether the claimant is owed money

---

[9] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

12

for work performed, and then require the claimant to re-litigate those same issues against the surety in order to recover on the bond. The court also notes that the Eleventh Circuit has clearly and recently applied the aforementioned general principle regarding the binding nature of judgments against the principal to a Miller Act surety. *See Drill South*, 234 F.3d 1232. Also, unlike *Hendry*, Defendant Gray had the opportunity to intervene in the arbitration. Like the surety in *Drill South*, the indemnity agreement between the parties appointed Gray as attorney-in-fact[10] and, therefore, Gray certainly had the right to defend

---

[10] The surety agreement between GTS and Gray states in relevant part:

> 12) The Indemnitors irrevocably constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all rights of the Indemnitors assigned to the Surety, and, in the name of the Indemnitors, to execute and deliver any other assignments or documents deemed necessary by the Surety to effectuate and exercise the rights given it under this Agreement including, but not limited to, the right to endorse the name of any Indemnitor upon any securities, checks, drafts or evidences of debt. The Indemnitors hereby ratify and confirm all acts and actions taken by the Surety as such attorney-in-fact.
>
> . . . .
>
> The Surety may adjust, settle or compromise any claim, demand, suit or judgment upon any Bonds. If requested by an Indemnitor, the Surety shall litigate such claim or demand or defend such suit, or appeal from such judgment, provided that the Indemnitor deposits with the Surety, at the time of such request, collateral satisfactory to the Surety to be used to pay any judgment rendered plus interest, costs, expenses and fees, including those of the Surety.

D.E. [50], Ex. A, at 2. GTS assigned to Gray "all rights of the Indemnitors in, arising from, or related to . . . any bonded or unbonded contracts or any extensions, modifications, alterations or additions thereto . . . ." *Id*.

AO 72A
(Rev.8/82)

GTS in the arbitration proceeding and thereby protect its bond. If Defendant Gray had notice of the arbitration proceeding against its surety and the opportunity to defend, then Gray is bound by the arbitration award.

Gray had the opportunity to defend GTS in the arbitration proceedings, despite Gray's contention that this court had not yet named it GTS' attorney-in-fact. The indemnity agreement between Gray and GTS irrevocably appoints Gray as GTS' attorney-in-fact. As the court in *Drill South* said, as long as the Indemnity Agreement "conferred a right to defend" on the surety, even if no obligation to defend exists, the surety had the opportunity to defend. 234 F.3d at 1234. The fact that Gray asserted a cross-claim against GTS is also of no consequence. *Id.* ("We do not believe that there is anything unusual about an insurance company or surety defending a principal or insured against suits by third parties, while simultaneously maintaining an action against the insured or principal . . . ."). Gray could have stepped in as GTS' attorney-in-fact at any point, including during the arbitration.

Gray also contends that it did not have full notice of the arbitration because Kratos did not inform Gray of the exact date of the preliminary hearing or the exact date of the arbitration proceeding. Gray offers no case law supporting its contention that notice of the exact dates of the arbitration proceeding and preliminary hearing is required to constitute notice. Gray was fully aware that Kratos was pursuing arbitration for its claim against GTS. Kratos sent Gray a copy of the arbitration demand and invited Gray to participate in the

14

arbitration on multiple occasions. As a party to this case, Gray also had full access to the docket, which clearly showed Kratos and GTS were contemplating arbitration. As an example of such notice, the docket shows that GTS filed a motion to stay the arbitration proceedings almost six months before the arbitration proceeding took place. D.E. [45]. Gray actually opposed a stay of the proceedings, D.E. [50], and stated that it would not participate in the arbitration until it was named attorney-in-fact. D.E. [67], at 5 n. 6. Gray had notice of the pending arbitration. Furthermore, Kratos attempted to keep Gray updated about the arbitration proceedings. Gray cannot have expected Kratos to continue to inform it about an arbitration proceeding Gray stated it would not participate in. Gray "should not be permitted to stand back and allow a judgment to be taken setting the amount of recovery against its principal without similarly being bound by the judgment." *Drill South*, 234 F.3d at 1236. The court finds that an arbitration award against a principal contractor is binding against a Miller Act surety where, as here, such surety had notice and the opportunity to defend.

Gray admits that it issued a bond on GTS' behalf for the CDC project, and the Miller Act allows a subcontractor to recover against that bond for labor and materials furnished. Generally, the arbitrator found that Kratos performed work on the CDC project, GTS was paid for Kratos' work but failed to pay Kratos, and GTS' failure to pay Kratos constituted a breach of contract. D.E. [92-4], Ex. A, at 6. The arbitration award entitles Kratos to recover the following from GTS for breach of contract:

1.    The total sum of $255,291.86 in principal and interest . . . pursuant to the Fire Alarm Deliver Order;

2.    The total sum of $205,659.09 in principal and interest . . . pursuant to the Fiber Optic Delivery Order;

3.    Attorneys' fees and costs in the amount of $75,243.92;

4.    Arbitration fees and neutral compensation in the amount of $10,410; and

5.    Additional interest from the date of the hearing through the date of [the] Award in the amount of $7,939.14.

*Id.* at 8. The total amount for which the arbitrator found GTS liable is $554,544.01. Gray argues that even if the arbitration award is enforceable against Gray, it is limited to Gray's liability under the Miller Act. Gray asserts that Kratos "has made no showing that the award for attorney's fees, costs, arbitration fees, neutral compensation, and interest in the arbitration are compensable under the Act." D.E. [133-1], at 24. Gray does not, however, cite in law for the proposition that Kratos is not entitled to those sums. In response, Kratos addresses only attorney fees and interest, and does not address the arbitration fees and neutral compensation. First, Kratos argues that attorneys' fees are proper. For this proposition Kratos cites *United States ex rel. Cal's A/C & Electric v. The Famous Construction Corp.*, 34 F. Supp. 2d 1042 (W.D. La. 1999) and *United States ex rel. Sherman v. Carter* 353 U.S. 210, 2201-21 (1957). Kratos also notes that Gray is liable for pre-

16

judgment interest, citing *McKenney's, Inc. v. Gov't Technical Servs., LLC*, 531 F. Supp. 2d 1375, 1390 (N.D. Ga. 2008).

The court first addresses attorneys' fees. In *F.D. Rich Co., Inc.*, 417 U.S. at 127-31, the Supreme Court held that attorneys' fees could generally not be awarded in Miller Act cases because the statute does not provide for such recovery. Furthermore, "[t]he Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law."[11] *Id*. Kratos cites *United States ex rel. Cal's A/C & Electric v. The Famous Construction Corp.*, 34 F. Supp. 2d 1042, for the proposition that the Miller Act now expressly allows for attorneys' fees because it has been amended by the Prompt Pay Act, 31 U.S.C. § 3950(j). That court held that it is now "expressly allow[ed] for subcontractors on federal projects to sue for the awarding of attorney's fees and penalties for late payment or nonpayment on the payment bond held by the surety *provided that* state law allows for such causes of action." *Id*. at 1044. Because Louisiana explicitly provided that attorneys' fees could be collected in an action for collecting payments due to subcontractors and suppliers, the court allowed attorneys' fees.

---

[11] Prior to the Court's decision in *F.D. Rich*, many courts looked to state law regarding attorneys' fees. *See, e.g.*, *Hendry*, 391 F.2d at 20-21. However, this circuit has recognized that based upon *F.D. Rich*, attorneys' fees should generally not be awarded in Miller Act cases, and an award of attorneys' fees must be based upon federal law. *United States ex rel. Micro-King Co. v. Cmty. Sci. Tech., Inc.*, 574 F.2d 1292, 1294 n. 1 (5th Cir. 1978) ("Rich . . . runs contrary to and by implication overrules an unbroken line of Miller Act cases in this Circuit holding that state law 'governs' the award of attorneys' fees through incorporation into federal law.").

However, in *United States ex rel. Cal's A/C and Elec. v. Famous Constr. Corp.*, 220 F.3d 326, 328 (5th Cir. 2000), the Fifth Circuit vacated that decision, holding that the Prompt Payment Act did not mandate the result the district court reached. Instead, the Fifth Circuit held that the subcontractor could recover on its attorneys' fees, based upon the Louisiana statute cited by the district court, but only against the subcontractor, not the surety. *Id.* at 329. "[R]ecovery on the bond must be under the Miller Act." *Id.* Kratos's citation to the district court opinion in *Famous Construction Corp.*, 34 F. Supp. 2d 1042, is irrelevant.

The Supreme Court did recognize that there might be exceptions to the general rule that the Miller Act does not allow for attorneys' fees, such as where the opposing party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[12] *F.D. Rich Co., Inc.*, at 130. The arbitration award against GTS is for breach of contract, and the arbitrator awarded attorneys' fees on the basis of O.C.G.A. § 13-6-11, which provides for attorneys' fees for bad faith on behalf of the opposing party. However, Kratos' claim against Gray is brought pursuant to the Miller Act, and Kratos can only recover for those remedies provided by federal law. Kratos' complaint against GTS and Gray is based only on the Miller Act, and it does not allege that GTS acted in bad faith, vexatiously, wantonly, or for oppressive reasons. It simply states that GTS failed and neglected to pay Kratos the amount owed for

---

[12] There also may be an exception where the contract between the prime contractor and the subcontractor allows attorneys' fees. *United States ex rel. Krupp Steel Prods., Inc. v. Aetna Ins. Co.*, 831 F.2d 978, 984 (11th Cir. 1987). However, Kratos does not make this argument and points to no portion of the agreement between it and GTS that provides for attorneys' fees.

work performed. While the arbitrator may have found differently pursuant to a state law claim for breach of contract, that does not govern the court's determination under the Miller Act. Therefore, Kratos has not shown that it is entitled to attorneys' fees under the Miller Act, nor did Kratos address Gray's allegations that it was not entitled to arbitration fees and neutral compensation, and therefore, the court declines to award them.

Finally, Kratos was awarded prejudgment interest by the arbitrator. As Kratos points out, "The Miller Act is treated as incorporating state law on the issue of whether to award prejudgment interest." *McKenney's, Inc.*, 531 F. Supp. at 1380 (citing *United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677-78 (11th Cir. 1987)). *See also* O.C.G.A. § 7-4-16. Prejudgment interest is allowed on liquidated claims under Georgia law. *United States ex rel. Georgia Elec. Supply Co. v. United States Fid. & Guar. Co.*, 656 F.2d 993, 997-98 (11th Cir. 1981).

Plaintiff Kratos' motion for summary judgment is GRANTED IN PART and DENIED IN PART [113]. The arbitration award against GTS is binding on Gray, but Kratos cannot recover attorneys' fees or arbitration fees and neutral compensation from Gray. The only costs recoverable are the $255,291.86 in principal and interest for the Fire Alarm Delivery Order, the $205,659.09 in principal and interest on the Fiber Optic Delivery Order, and the $7,939.14 in additional prejudgment interest, for a total of $468,890.09. The court has already confirmed the arbitration award as to GTS, and entered judgment in favor of

19

Kratos against GTS in the amount of $554,544.01. The court hereby enters judgment in favor of Kratos against Gray in the amount of $468,890.09.

### III. Motion for Summary Judgment [117], Motion for Summary Judgment [126], Motion to Strike [130], and Motion to Supplement [152]

#### A. Motion to Strike and Motion to Supplement

Before addressing the merits of the parties' motions for summary judgment, the court must decide CCG's motion to strike the Affidavit of Aldos Vance, Gray's attorney, and the attached exhibits [130]. The affidavit and exhibits were relied on by Defendant Gray in its motion for summary judgment and its statement of material facts. Plaintiff CCG divides the exhibits, which are emails, into three classes.[10] The first class includes those emails created by individuals other than CCG: Exs. I.C, I.D, I.E, I.H, I.I, I.J, I.K, I.L, I.M, I.N, I.O, I.P, I.Q, I.U, I.W, I.X, I.Y, I.Z, I.AA, I.CC, I.DD, I.FF, and I.GG. CCG contends that the Class One emails are not properly authenticated and, furthermore, are hearsay. CCG does not seem to actually question the authenticity of any of the emails, nor does CCG attempt to explain why many of the emails are hearsay. The second class of emails includes those prepared by, or containing portions of emails prepared by, CCG employees or representatives: Exs. I.R, I.S, I.T, I.U, I.V, I.X, I.Y, and I.Z. According to CCG, the Class Two emails should be stricken because they are not properly authenticated through deposition testimony, affidavits, or

---

[10] Plaintiff CCG has no contention with this court's reliance upon the Class Three emails: Exs. I.E, I.F, I.G, I.BB, and I.EE.

otherwise. CCG asks this court not to consider either the Class One or Class Two emails because they are inadmissable to establish material facts for summary judgment purposes.

CCG's argument as to the authenticity of the exhibits is unavailing for several reasons. First, "there is no requirement that evidence be presented in admissible form as long as the evidence would be admissible at trial. The evidence at issue would likely be admissible at trial." *Cooper v. Southern Co.*, 260 F. Supp. 2d 1258, 1272 n. 7 (N.D. Ga. 2003) (Evans, J.) (internal citations and quotations omitted). Moreover, circumstantial evidence can be relied upon to show the authenticity of a document, "including the document's own distinctive characteristics and the circumstances surrounding its discovery." *U.S. v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990). Here, Gray contends, and CCG does not deny, that the Class One and Two emails were produced by CCG during discovery. Because the emails were produced by CCG during the discovery process, the circumstances surrounding their discovery indicate authenticity. *See Sklar v. Clough,* No. 1:06-CV-0627-JOF, 2007 WL 2049698, at *4 (N.D. Ga. 2007) (Forrester, J.) (deeming emails authentic where produced by one party during discovery and offered by the party opponent against the producing party). Because this court can consider evidence on a summary judgment motion that would be admissible at trial, and the court finds that these documents likely could be authenticated at trial, the court will not strike the emails based on authenticity concerns.

AO 72A
(Rev.8/82)

The court is equally unconvinced by CCG's blanket assertion that the Class One emails are hearsay. Again, while courts cannot rely on inadmissable hearsay to decide a motion for summary judgment, courts can rely on evidence that can be "reduced to admissible evidence at trial and reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). "[T]he out-of-court statement . . . must be admissible at trial for some purpose. For example, the statement might be admissible because it falls within an exception to the hearsay or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence)." *Id*. at 1323-24 (internal citations omitted). Gray relies on many of the Class One emails for non-hearsay purposes, like showing the non-existence of a contract or for reasons other than proving the truth of the matter asserted. Furthermore, after a review of the emails, they are likely to be admissible under the business records exception of Rule 803(6) of the Federal Rules of Evidence. The emails generally purport to be sent to or from parties to this litigation or other relevant individuals, such as Code 4 employees. The information in the emails could also be admitted through the testimony of their authors. Plaintiff CCG's motion to strike is DENIED [130].

With its motion for summary judgment, CCG provided a statement of material facts as required by Local Rule 56.1. Gray was required to include a response to CCG's material statement of facts with its April 22, 2009 response brief. L.R. 56.1B(2)(a). However, Gray

AO 72A
(Rev.8/82)

did not provide the required response. Instead, Gray merely included its own statement of material facts that did not correspond with or respond to any of the numbered paragraphs provided in CCG's statement of material facts.[12] On June 3, 3009, Gray moved to supplement its response to CCG's motion for summary judgment by adding the required response to CCG's statement of material facts. CCG argues that Gray should not be allowed to supplement because Gray's filings are untimely, and Gray has offered no reason for its failure to follow the local rules.

Gray's motion is essentially the same as the motion to supplement previously discussed by the court, and the court finds it unnecessary to repeat the law. Although Gray clearly did not comply with this court's local rules, the court does not find it advantageous to deny Gray's motion to supplement. The law favors a disposition of a case on the merits, and CCG does not argue that it would be prejudiced in any way by Gray's failure to abide by the local rules. Furthermore, Gray, in its own motion for summary judgment against CCG and its attached statement of material facts, clearly disputes many if not all of the same facts and issues that appear in CCG's motion for summary judgment and attached statement of material facts. The parties often cite to the same deposition to support their opposing factual statements, and even if CCG's statement of material facts were deemed admitted, "the

---

[12] CCG also takes issue with Gray's failure to respond to CCG's additional statement of material facts as required by Local Rule 56.1B(3). However, that rule does not require the court deem anything admitted. *Contra* L.R. N.D. Ga. 56.1B(2)a(2).

AO 72A
(Rev.8/82)

district court must [still] review the movant's citations to the record to 'determine if there is, indeed, no genuine issue of material fact.'" *Reese*, 527 F.3d at 1269. Therefore, Gray's motion to supplement is GRANTED [152].

###    B.    Motions for Summary Judgment

The court now addresses Gray and CCG's cross-motions for summary judgment. Gray issued the required Miller Act bond for GTS, which allowed GTS to become the prime contractor for the CDC BAS/LAN project. As part of the contract between the CDC and GTS, GTS was to "install a fiber optic cabling network known as a FacLAN." D.E. [128-2], at ¶ 6. GTS originally hired Kratos to complete the work, but terminated Kratos in August of 2007. After Kratos' termination, both CCG and Code 4 began working with GTS in some capacity regarding the fiber optic cabling network. While the parties dispute the nature of CCG's involvement in the project, the following facts are not disputed and are established by the record. Code 4 became involved in the CDC project prior to CCG's involvement. D.E. [126-16], at 26. For example, on August 13, 2007, GTS issued a "Notice of Intent to Issue a Purchaser Order to Code 4 Systems, Inc. for the completion of the FACLAN project at the Centers for Disease Control and Prevention in Atlanta, Georgia." D.E. [126-15], Koebler Depo., Defendant's Ex. 26. However, Code 4 was a small company and had trouble obtaining the financing necessary to fund its work on the CDC project. D.E. [126-8], at 61. Code 4 had previously established a working relationship with CCG, *id.*, and Everett Cope

of Code 4 asked CCG's Chief Executive Officer, Timothy Slater, if CCG would like to work on the CDC project. D.E. [126-16], at 26-29. CCG agreed to take part in the CDC project in some capacity. *Id.*

It is CCG's position that it then entered into a subcontract with GTS on October 23, 2007,[13] and hired Code 4 as a sub-subcontractor. Gray, on the other hand, argues that there is no contract between GTS and CCG, and even if there is, CCG merely provided financing for Code 4 and was not actually a subcontractor. There is no dispute, however, that CCG and Code 4 were both involved in the CDC project. Code 4 worked onsite and handled the installation of the fiber optic system. *See* D.E. [126-16], at 18-19. No employee from CCG ever visited the CDC site. *Id.* Instead, CCG was involved only in invoicing GTS for the work performed by Code 4. *See, e.g.*, D.E. [117], Ex. I, at Ex. I.V. Most of the work on the CDC project was finished, but work stopped after GTS failed to remit any progress payments to CCG. D.E. [126-16], at 19-22. *See also* D.E. [152-2], at ¶¶ 19-24.

CCG brought suit against both GTS and Gray in July of 2008, with a claim against GTS for breach of contract and claims against Gray for payment under the federal Miller Act and for a violation of O.C.G.A. § 10-7-30, refusal of a corporate surety to remedy default. In total, CCG's complaint requested $239,009.14, plus pre and post judgment interest, and

---

[13] CCG attached the alleged subcontract to its complaint, and it is also attached as an exhibit to the deposition of Henry Koebler. *See* D.E. [126-11], Koebler Deposition, Plaintiff's Ex. 2. The contract is dated October 23, 2007, and it was signed by Timothy Slater on November 1, 2007. The attached copy of the subcontract is not signed by Joseph Terry of GTS, although there is a space for his signature.

attorneys' fees and costs. D.E. [53], Ex. G, at 10. Both Gray and CCG filed motions for summary judgment. In its motion, Gray only addresses CCG's claim against it under the Miller Act, and it argues that CCG is not covered by the Miller Act because it is a creditor of Code 4, rather than a subcontractor for GTS, and CCG did not furnish labor or materials for GTS. In its reply to CCG's motion for summary judgment, Gray further argues that there was no contract between GTS and CCG. CCG contends that it did in fact have a subcontract with GTS, making it a subcontractor rather than a creditor. CCG further argues that Code 4 is a sub-subcontractor, CCG has paid Code 4 in full for all work done on the CDC project, but neither CCG nor Code 4 have been paid by GTS or Gray, despite demands on both companies to do so. Therefore, CCG alleges that Gray, as GTS' surety, must pay CCG for the work done on the CDC contract. For the same reasons, CCG requests summary judgment on its breach of contract claim against GTS.

The Miller Act requires general contractors on certain federal construction projects to get a payment bond. *F.D. Rich Co., Inc.,* 417 U.S. at 121-22. That bond is intended to protect those who supply labor and materials for the project. *Id.*

> Ordinarily, a supplier of labor or materials on a private construction project can secure a mechanic's lien against the improved property under state law. But a lien cannot attach to Government property, so suppliers on Government projects are deprived of their usual security interest. The Miller Act was intended to provide an alternative remedy to protect the rights of these suppliers.

AO 72A
(Rev.8/82)

*Id*. However, the Miller Act does not extend endlessly, and a direct contractual relationship with either the prime contractor or a subcontractor is required. *Bateson v. United States ex rel. Bd. of Trs. of the Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 589-90 (1978). While those in more remote relationships are not protected, the Miller Act is "highly remedial" and therefore, entitled to a "liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944). Title 40 U.S.C. § 3133(b)(1) allows a civil suit by someone who furnished labor or materials while working on a project for which a Miller Act bond was issued if that person was not paid within ninety days of finishing the work.

To recover under the Miller Act, CCG must show that (1) it entered into a subcontract with GTS, (2) Gray issued a payment bond pursuant to the Miller Act, (3) CCG complied with statute of limitations under the Act,[14] (4) CCG completed work under the subcontract, and (5) CCG was not paid for the labor or materials furnished. *See McKenney's, Inc.*, 531 F. Supp. 2d at 1378. There is no real dispute as to issues two, three, and five. Gray admits that it issued a bond under the Miller Act on behalf of GTS for the CDC project. D.E. [117-2], at ¶¶ 2-4. It is not disputed that Code 4 completed work on the FacLAN portion of the

---

[14] CCG argues that it has to show that it gave proper notice to Gray, but the court notes that CCG alleges it has a direct contractual relationship with the prime contractor, and such notice is only required of those who do not deal directly with the prime contractor. *See* 40 U.S.C. § 3133(b). Furthermore, Gray does not dispute that if there are applicable notice or statute of limitations requirements in the present case, they have been met by CCG.

CDC project, that CCG issued invoices to GTS for that work, and GTS has paid neither CCG nor Code 4 for the work performed.[15] *E.g.*, D.E. [126-16], at 19-22; D.E. [126-6], at 20-21, 36-37, 43. Gray also does not contend that CCG failed to comply with any applicable notice requirement or statute of limitations under the Miller Act. Gray only argues that CCG did not perform the work, Code 4 did, and therefore, CCG is not a subcontractor and cannot recover for the work done by Code 4. The issues between the parties then are (1) whether a contract, specifically a subcontract, between GTS and CCG existed, and (2) whether CCG, in view of the relationship between the parties, is a proper claimant under the Miller Act.

CCG argues that a written contract between the parties exists, which required CCG to complete the FacLAN portion of the CDC project. To support that argument, CCG offers the purported contract, which is signed only by Tim Slater, CCG's Chief Executive Officer. D.E. [126-11], Koebler Deposition, Plaintiff's Ex. 2. The document contains a page entitled "Statement and Acknowledgment," which is dated October 23, 2007. *Id*. It states that GTS is the prime contractor while CCG is the subcontractor, and it also describes the scope of the work as "Perform the following per the plans and specifications and per Capital Computer

---

[15] Gray's response to CCG's material statement of facts does not dispute the fact (1) that CCG sent GTS six invoices for the work completed by Code 4 on the CDC project, (2) that Hank Koebler of GTS received all six of the invoices, reviewed them, and thought they were correct and should be paid, (3) that GTS' president said he intended to pay them, (4) that CCG never received those payments, (5) that there were no problems with the work performed, and (6) that the total amount of the invoices issued by CCG was $239,009.14. D.E. [152-2], at ¶¶ 19-24. Instead, Gray merely responds that those facts are not material to the court's decision. *Id*.

28

Group's 10-31-07 (attached to delivery order)." *Id*. There is no delivery quote attached, but the purported contract also describes the project as being installation of a "BAS/LAN/Fire Alarm System at the Atlanta Campuses" of the CDC. *Id*. The Statement and Acknowledgment is not signed by GTS, only CCG. *Id*. The next page is a "Delivery Order Form," which also refers to CCG as a subcontractor and involves installing a BAS/LAN/Fire Alarm System at the Atlanta CDC Campus. *Id*. Both the Delivery Order and the Statement of Acknowledgment refer to that master agreement between CCG and GTS. *Id*. Along with those documents is the actual purported Master Agreement between GTS and CCG, which again refers to GTS as the contractor and CCG as the subcontractor.[16] *Id*. That document is also only signed by CCG and not GTS. *Id*. Timothy Slater testified that CCG and GTS entered into a contract and that through the contract, CCG undertook "laying fiber optic cable." D.E. [126-15], Slater Depo. at 29.

CCG also offers, as evidence that a subcontract exists, the testimony of Henry Koebler, the Director of Operations for GTS from 2006-2008. Koebler is no longer employed by GTS but was during the times relevant to this case. Koebler testified that GTS and CCG entered into a contract, and that the written agreement mentioned above is the agreement that governs the terms of the CCG-GTS relationship. D.E. [126-6], Koebler

---

[16] The proffered Master Agreement requires that CCG, as subcontractor, maintain certain insurance and bonds. D.E. [126-11], Koebler Deposition, Plaintiff's Ex. 2. It also provides for progress payment, which are contingent upon GTS receiving payment from the CDC. *Id*.

29

Depo., at 17-18. Furthermore, Koebler testified that he considered CCG to be the subcontractor for the FacLAN project, and it was his understanding that CCG could be sued under the contract if the work was not performed. *Id.* at 18-19. It was also Koebler's understanding that GTS' president, Joseph Terry, did sign the contract, but Koebler testified that he is unaware if a copy of the contract, bearing Terry's signature, actually exists. *Id.* at 19-20. CCG also provides evidence showing that pursuant to that contract, CCG hired Code 4 as a sub-subcontractor, and Code 4 completed a portion of the work that CCG subcontracted to do for GTS. *See* D.E. [126-6], Koebler Depo., at 33; D.E. [126-3], Shallenberger Affidavit. Koebler testified that at least 83% of the work was completed without problems. *Id.* at 33-37. CCG then offers undisputed evidence that it invoiced GTS for the work completed, Henry Koebler testified that those invoices were correct, and he thought they needed to be paid. D.E. [126-6], Koebler Depo., at 24. The invoices total $239,009.14. D.E. [126-11], Koebler Depo., Plaintiff's Exhibit 5. Moreover, according to the affidavit of Code 4's Operations Manager, Tom Shallenberger, Code 4 never entered into a subcontract with GTS, but it did enter into a sub-subcontract with CCG, pursuant to which, it invoiced CCG for the work Code 4 performed on the CDC project, and CCG paid Code 4 in full. [126-3], at 2-3.

To challenge CCG's assertion, Gray points to the fact that CCG has not proffered a signed subcontract, and alleges that GTS and CCG did not act as if they were in a prime

contractor/subcontractor relationship. Gray relies on a March 18, 2008 email written by Tim Slater of CCG and sent to Hank Koebler, a GTS employee. D.E. [117], Ex. I, at Ex. I. T. Slater writes "It has come to my attention that GTS never sent back the signed contract agreements between CCG & GTS." *Id*. Slater then requests that GTS send a signed copy of the contract as soon as possible. *Id*. Gray also offers a June 4, 2008 email written by Code 4's Everett Cope and sent to Tim Slater, in which Cope responds to a prior email he received from Slater. D.E. [117], Ex. I, at Ex. I.U. The email indicates that there was a contract, which Slater signed on behalf of CCG and sent to GTS. *Id*. However, the email indicates that no one at GTS ever signed the contract in return. *Id*. Gray also relies on the deposition of Tim Slater, in which he states that CCG has no signed delivery order or subcontract from GTS. D.E. [126-16], Slater Depo., at 74-75. Gray, however, does not offer any testimony of any party involved that directly refutes Koebler's or Slater's testimony that a subcontract existed between GTS and CCG, or that it was embodied in that document provided by CCG. Gray instead cites several other emails, which it alleges show that the actions between the parties indicate that no contract existed. D.E. [117], Ex. I, at Ex. I.E, I.K, I.O, I.Q, I.R, and I.S.

Gray also alleges that, instead of entering into a subcontract with CCG, GTS entered into a contract with Code 4. For this proposition, Gray again cites several emails. D.E. [117], Ex. I, at Ex. I.C, I.D, I.E, I.F, I.G, I.H, I.I, I.J, and I.K. The first eight emails are dated prior

31

to October 23, 2007, which is when CCG states it entered into a contract with GTS. Those emails detail upcoming meetings between GTS and Code 4, and they discuss Code 4 working on the FacLAN project and technical details surrounding the project. Gray also points to deposition testimony by Koebler stating that he "went with Code 4" because Tom Shallenberger of Code 4 "went the extra mile" and "was the one who did everything he could to make things go smoothly." D.E. [126-9], Koebler Depo., at 330. According to Gray, these emails show that a contract between Code 4 and GTS existed because they indicate a relationship between Code 4 and GTS prior to the alleged October 23, 2007 contract between GTS and CCG. Gray has not, however, provided a copy of any contract between GTS and Code 4, signed or otherwise.

CCG is not required to prove a written, signed contract in order to succeed on its Miller Act claim. *See United States ex rel. Leno v. Summit Constr. Co.*, 892 F.2d 788, 789-90 (9th Cir. 1989); *St. Paul Mercury Indemn. Co. v. United States ex rel. H.C. Jones*, 238 F.2d 917, 920-24 (10th Cir. 1956); *United States ex rel. Glickfeld v. Krendel*, 136 F. Supp. 276, 280 (D. N.J. 1955). Furthermore, Georgia law does not require that written contracts be signed in order to be valid. *See Comvest v. Corporate Sec. Group,* 234 Ga. App. 277, 280, 507 S.E.2d 21, 24-25 (1998) (finding that a party could be bound to an unsigned arbitration agreement under Georgia law). The court finds CCG has proffered sufficient evidence from which a jury could reasonably conclude that a subcontract existed between

CCG and GTS and that the terms of the agreement appear in the document offered by CCG.

Gray's own evidence does not directly dispute the existence of a contract between CCG and

GTS. Many of the emails and deposition portions cited by Gray demonstrate that even if that

contract was not signed, although it may have been, CCG and GTS contemplated that both

parties would sign it. Gray has also offered no evidence showing that any parties involved

dispute that a subcontract existed between GTS and CCG. In fact, Koebler, GTS' Director

of Operations for the CDC Project, repeatedly testified in his deposition that CCG and GTS

entered into a contract and that contract is the one proffered by CCG. *See e.g.*, D.E. [126-5],

at 17-20. Code 4 also states that CCG and GTS entered into a subcontract, and Code 4 never

entered into a subcontract with GTS. D.E. [126-3], Shallenberger Affidavit. It is undisputed

that GTS had full knowledge of the relationship between CCG and Code 4, Code 4

performed work on the FacLAN project, CCG invoiced GTS, and GTS never rejected Code

4's work or stopped Code 4 from performing work on the CDC project. D.E. [117], Ex. I,

at Ex. I.BB; D.E. [126-6], at 20-21, 36-37, 43.

But the existence of a contractual relationship between CCG and GTS does not end

the matter as far as the Miller Act is concerned. CCG must also show that it performed work

under the contract. Gray argues that it did not, averring that Code 4 did all of the work on

the project, and CCG did not know what the project was about and basically just forwarded

invoices sent to it by Code 4. In essence, the subcontract between CCG and GTS, if one

even existed, was a sham.[17] CCG on the other hand argues that it did perform actual work on its contract with GTS, which required that CCG complete the fiber optic portion of the project that Kratos did not finish. To complete that work, CCG hired Code 4 as a sub-subcontractor, just as CCG has hired Code 4 as a sub-subcontractor on other projects. D.E. [126-16], at 14, 17, 27. Code 4 was involved in the project first, but after determining that Code 4 did not have the finances necessary to fund the project, Code 4 contacted CCG to see if CCG was interested in becoming the subcontractor. D.E. [126-2], at 2. Both Code 4 and GTS consider CCG to be the subcontractor.[15] According to CCG, not only did all parties

---

[17] In an email from Code 4's Everett Cope to Gray's Louisiana counsel, Cope described the relationship between CCG, Code 4, and GTS:

> When Code 4 was originally approached by GTS to complete the CDC project, Code 4 attempted to establish a credit line with our factoring company in order to fund this project. Code 4 was denied funding due to GTS being deemed a "slow-pay" account. . . . With this in mind, since Code 4 and CCG had been performing many other projects together, the two companies undertook this project together. The contract was routed to CCG and then to Code 4 so financing could be established. All labor and management of this project has been under the supervision of Code 4 while CCG's good credit allowed Code 4 to establish financing.

D.E. [117], Ex. II, at Ex. II.C. The email further states that the CDC project is "actually being managed by Code 4," and GTS has "knowledge of the financial arrangement between Code 4 and CCG." *Id.* It seems that Code 4 would issue invoices to CCG, who would send those invoices to GTS. *See* D.E. [117], Ex. I, at Exs. I.BB. GTS would then pay CCG, who would in turn, retain 4% of the payment, and Code 4 would receive the rest. *See, e.g.*, D.E. [117], Ex. I, at Exs. I.R, I.S., I.V.

[15] D.E. [126-2], at 2 (Code 4 considered CCG the subcontractor); D.E. [126-5], at 17 (GTS considered CCG the subcontractor).

consider CCG the subcontractor, but CCG also provided labor and materials for the fiber optic project by hiring Code 4 as a sub-subcontractor. CCG contends that nothing in the Miller Act or the Supreme Court's definition of a subcontractor requires that the subcontractor be onsite or that it actually do physical labor. Nor does its financial arrangement with Code 4 preclude it from recovering under the Miller Act.

The question of whether one is a subcontractor within the definition of the Miller Act is a mixed question of law and fact. *United States ex rel. Morris Construction, Inc. v. Aetna Cas. Ins. Co.*, 908 F.2d 375, 377-78 (8th Cir. 1990). The Miller Act does not define "subcontractor," but in adopting a functional rather than a technical definition of the word, the Supreme Court has determined that a subcontractor is someone who "performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract . . . ." *Bateson*, 434 U.S. at 590. For instance, a party is a subcontractor if it "undertakes to do all the plumbing, or heating, or electrical work" on a project. *Aetna Cas. & Sur. Co. v. United States ex rel. Gibson Steel Co.*, 382 F.2d 615, 617 n. 2 (5th Cir. 1967). The Miller Act also does not define what it means to "furnish" labor or materials. The Supreme Court has considered it important to the analysis whether the prime contractor could have protected itself by requiring a bond or some other protection from the Miller Act claimant.[16] *MacEvoy*, 322 U.S. at 110.

---

[16] The Supreme Court has also discussed the substantiality and importance of the relationship between the claimant and the prime contractor. *See e.g.*, *F.D. Rich Co., Inc.*, 417 U.S. 116. However, that discussion is in reference to deciding whether someone is a

The court finds instructive *United States ex rel. CTI Ltd., Inc. v. Mellon Stuart Co.*, 860 F. Supp. 556 (N.D. Ill. 1994). There, Mellon Stuart contracted with the United States Postal Service to construct a postal processing center. *Id*. at 557. Mellon Stuart then subcontracted a portion of that work to Lockwood Glass Company. *Id*. Pursuant to the subcontract, Lockwood was required to post a performance bond. *Id*. To satisfy that obligation, Carl Seyfer guaranteed a $75,000 letter of credit, and if Lockwood defaulted, Mellon Stuart could draw on the letter of credit. *Id*. However, to better protect Seyfer, Mellon Stuart, Lockwood, and Seyfer entered into a separate agreement. *Id*. Under that agreement, if Lockwood did default, Seyfer could elect to assume Lockwood's obligations and duties under the subcontract between Lockwood and Mellon Stuart rather than forfeit the money guaranteed under the letter of credit. *Id*. Lockwood defaulted, and Seyfer chose to undertake Lockwood's duties. *Id*. at 557-58. Seyfer and Mellon Stuart entered into another agreement, which stated that Seyfer would complete the portion of the subcontract left unfinished by Lockwood, and because Seyfer was not licensed to do the work, he would subcontract the work out to a company called CTI Ltd. *Id*. at 558. CTI performed the work, and Seyfer and CTI invoiced Mellon for that work. *Id*. Mellon did not pay all of the invoices in full, and Seyfer and CTI sued both Mellon Stuart and Mellon's Miller Act surety to

---

subcontractor or simply a materialman. Here, no one argues that the work performed by Code 4 is not the type of work that qualifies as that of a subcontractor. Nor is there any argument that Code 4 had a limited relationship with GTS or limited involvement with the construction project. Instead, the issue is whether CCG, based upon its Code 4's work and actions, can recover under the Miller Act.

recover the unpaid money. *Id*. The surety moved for summary judgment contending that because Seyfer was merely Lockwood's guarantor, not a "subcontractor," neither Seyfer nor CTI could make claims against the Miller Act bond. *Id*.

The court first determined that Mellon Stuart and Seyfer had a contractual relationship based upon the original agreement between Mellon, Seyfer, and Lockwood, as well as the subsequent agreement between Mellon and Seyfer whereby Seyfer assumed Lockwood's responsibilities under the subcontract between Mellon and Lockwood. *Mellon Stuart*, 860 F. Supp. at 559. The court then noted the surety "exalt[ed] form over substance and ignore[d] the commercial reality" of the relationships between Mellon, Lockwood, and Seyfer. Even though the original agreement between the three parties defined Seyfer's obligations as Lockwood's guarantor, this did not negate the fact that it also provided Seyfer the option of "stepping into Lockwood's shoes" as the subcontractor, despite the fact that Seyfer himself could not perform any of the work on the contract himself and had to hire a subcontractor. *See id*. at 560. The court further held that Mellon, by contracting with Seyfer, "opened the door for Seyfer to assume the position of subcontractor," and the court could "find no sound reason in law or logic to conclude that Seyfer is foreclosed from being afforded subcontractor status merely" because he undertook completing the subcontract to avoid losing the $75,000 guaranteed by the letter of credit. *Id*. The *Mellon Stuart* court also found it relevant that Mellon Stuart contracted directly with Seyfer to allow him to assume

37

Lockwood's duties under the subcontract and that Mellon Stuart initially approved of Seyfer as a guarantor. *Id*. Furthermore, the court noted that Mellon could have required Seyfer to post a payment bond as a condition of undertaking to complete the Lockwood subcontract. *Id*. Based upon the above, the court found that Seyfer was covered by the Miller Act. *Id*. at 560-61.

While not quite factually the same, the court finds the logic of the *Mellon Stuart* court persuasive. In the present case, the best support for the notion that CCG is a subcontractor is the fact that CCG has offered evidence that it entered into a direct contractual relationship with GTS through which it undertook to complete part of GTS' work on the CDC project. That the purpose behind that undertaking was to allow Code 4 to achieve the requisite financing it needed to work on the CDC project does not alter the fact CCG was still bound to fulfill its obligations under that subcontract. The parties' motivations for structuring their relationship the way they did do not change that, and this is especially so where GTS was aware that Code 4 could not achieve the requisite financing without CCG's involvement, and did not object to the relationship between CCG and Code 4. GTS certainly had the ability to require CCG to post a payment bond or otherwise protect itself.[17]

Gray relies heavily on the fact that no CCG employee visited the CDC site or performed physical labor. As stated earlier, the Miller Act was intended to provide

---

[17] The court notes that the subcontract offered by CCG does require that CCG have certain insurance or bonds. D.E. [126-11], Koebler Deposition, Plaintiff's Ex. 2.

38

government subcontractors and materialmen with relief similar to that provided by state laws allowing mechanic's liens. *Id*. Generally, "a subcontractor is entitled to a [mechanic's] lien not only for his or her own labor, but also for labor actually performed by other persons whom the subcontractor employs." 56 C.J.S. *Mechanics' Liens* § 88 (2009). Furthermore, while some courts have limited the definition of a subcontractor under the Miller Act to someone who performs physical labor onsite, others have not. *See e.g.*, *American Sur. Co. of New York, v. United States ex rel. Barrowagee Labs., Inc.*, 76 F.2d 67, 68 (5th Cir. 1935); *United States ex rel. Wellman Eng'g Co.*, 350 F.2d 285, at 286 (2d Cir. 1965). *Cf. Mellon Stuart*, 860 F. Supp. 556. If CCG did undertake, by contract, to do a portion of the CDC project, how it implemented that contract (hiring Code 4) does not necessarily alter its status as subcontractor. The definition by the Supreme Court simply states that a subcontractor is one who undertakes a portion of the prime contractor's duties, and the Miller Act itself, only requires that the person recovering on the bond have furnished labor and materials. The fact that CCG was not onsite, and Code 4 did all of the actual work, does not change the fact that CCG could still have been liable to GTS for the failure to complete or properly execute the work on the CDC project, and therefore, does not remove CCG from being considered a subcontractor. The cases cited by Gray for the proposition that physical labor is required or that mere invoicing does not make someone a subcontractor are factually distinguishable from the case at hand and not binding on this court.

39

Gray is correct that courts have generally held that one who solely loans or advances money to a subcontractor cannot recover on a bond issued under the Miller Act. *See, e.g.*, *United States ex rel. First Cont'l Nat'l Bank & Trust, Co. v. Western Contracting Corp.*, 341 F.2d 383, 387 (8th Cir. 1965); *Village of Cambridge, Illinois ex rel. Shilling v. Hartford Accident & Indem. Co.*, 253 F.2d 599, 600 (7th Cir. 1958). This is true even where that money helped furnish labor and materials. *Western Contracting Corp.*, 341 F.2d at 387. However, Gray cites no case that stands for the proposition that an entity cannot both be a subcontractor and loan money or finance a project or be a guarantor on a project, if that entity also furnishes labor and materials. CCG is obviously not a creditor in the normal sense of the word. It is not in the business of making loans, nor did it actually loan any money to Code 4. Furthermore, unlike the typical creditor situation in the cases cited by Gray, the evidence shows that GTS and CCG formed a contractual relationship of their own, and GTS had the ability to protect itself through that direct relationship, and it is clear that GTS was aware that CCG was going to hire Code 4 to do all the work on the project. While Gray repeatedly argues that Code 4 is the actual subcontractor, it also admits that Code 4 could not take the CDC project on its own because it could not obtain financing. The financial relationship between the parties does not preclude CCG from being a subcontractor, and therefore, covered by the Miller Act.

AO 72A
(Rev.8/82)

Gray has admitted that it issued a payment bond for the CDC project. D.E. [117-3], at ¶ 2-4. It is also not disputed that CCG complied with the statute of limitations under the Miller Act, that work was completed on the FacLAN project, and neither CCG nor Code 4 have received any money from GTS or Gray. D.E. [152-2], at ¶¶ 19-24. With respect to the contested issue, this court held that CCG was in fact a subcontractor for GTS on the CDC project. Gray does not dispute CCG's calculation of damages at $239,009.14, which is based upon invoices undisputedly sent to GTS. D.E. [152-2], at ¶ 24. Therefore, the court GRANTS CCG's motion for summary judgment as to its claim against Gray under the Miller Act, and awards it the uncontested amount of $239,009.14 [126]. Further, the court DENIES Gray's motion for summary judgment [117].

CCG also requested prejudgment interest at the legal rate on the $239,009.14. As stated previously, "[t]he Miller Act is treated as incorporating state law on the issue of whether to award prejudgment interest." *McKenney's, Inc.*, 531 F. Supp. at 1380. Prejudgment interest is allowed on liquidated claims under Georgia law. *United States ex rel. Georgia Elec. Supply Co. v. United States Fid. & Guar. Co.*, 656 F.2d 993, 997-98 (11th Cir. 1981). *See also* O.C.G.A. § 7-4-16. Thus, prejudgment interest is appropriate. Gray has not questioned CCG's calculation of the amount of principal or interest. The court GRANTS CCG's motion for summary judgment regarding its claim for prejudgment interest and

AO 72A
(Rev.8/82)

awards prejudgment interest at the legal rate. Gray is DIRECTED to pay $239,009.14 plus prejudgment interest at the legal rate.

CCG also moved for summary judgment on its breach of contract claim. The Miller Act does not replace a subcontractor's claims under state law, including remedies for breach of contract. However, "the Miller Act is the substitute for Plaintiff's right to obtain a mechanic's lien on the property on which Plaintiff supplied labor and material. Mechanics liens, under state law, and the Miller Act, under federal law, protect the laborers and materialmen when they are not able to recover under contract law." *United States ex rel. Superior Insulation Co. v. Robert E. McKee, Inc.*, 702 F.Supp. 1298, 1302 (N.D. Tex. 1988). Here, the court granted CCG's motion for summary judgment on its Miller Act claim, and its breach of contract claim arises out of the exact same facts and requests the same amount in damages. The court holds that in the present case, CCG cannot recover on both its Miller Act claim, and its breach of contract claim against GTS. Plaintiff's motion for summary judgment on its breach of contract claim is DENIED [126]. In conclusion, Plaintiff's motion for summary judgment is GRANTED IN PART, as to its Miller Act claims, as described above, but DENIED IN PART, as to its breach of contract claims.

## IV. Defendant Gray's Motion to Vacate Arbitration Award [135]

Pursuant to their subcontract, Kratos and GTS decided to arbitrate Kratos' claims against GTS. The arbitration proceeding occurred on December 16, 2008. As previously

discussed, neither Gray nor GTS were present at the arbitration. The arbitrator issued an

award on January 28, 2009, in favor of Kratos, awarding it:

1. The total sum of $255,291.86 in principal and interest through the date of the hearing pursuant to the Fire Alarm Delivery Order;

2. The total sum of $205,659.09 in principal and interest through the date of the hearing pursuant to the Fiber Optic Delivery Order;

3. Attorneys' fees and costs in the amount of $75,243.92;

4. Arbitration fees and neutral compensation in the amount of $10,410; and

5. Additional interest from the date of the hearing through the date of this Award in the amount of $7,939.14.

D.E. [135], Ex. A, 8. This court affirmed that award on March 27, 2009. D.E. [124]. Gray

brought this timely motion to vacate the arbitration award on April 13, 2009. Despite being

GTS' attorney-in-fact, Gray brought the current motion to vacate the arbitration award only

on behalf of Gray.

In its motion to vacate, Gray argues, again, that it had no notice of the hearing and

no opportunity to present defenses.[18] Gray further argues that the arbitration award was

procured by fraud because Kratos failed to present relevant evidence, presented evidence

---

[18] The court has already determined that Gray had both notice and opportunity, and therefore, will not address this argument again.

AO 72A
(Rev.8/82)

it knew to be false, and because the arbitration award contains findings of fact that are contradicted by the record. Gray also requests that Kratos' claim be reduced "by the costs incurred by GTS in assisting it with correcting its deficient performance." D.E. [135], at 7. In turn, Kratos argues that Gray has no standing to challenge the award because it was not a party to the arbitration, Gray cannot challenge an award that has already been affirmed, and Gray cannot meet the Eleventh Circuit standard for showing fraud.

Review of an arbitration award is governed by the Federal Arbitration Act (FAA), and review is "narrowly limited." *Lifecare Intern., Inc. v. CD Med., Inc.*, 68 F.3d 429, 433 (11th Cir. 1995). "[T]he FAA presumes that arbitration awards will be confirmed, [and] consequently, federal courts should defer to the arbitrator's resolution of the dispute whenever possible." *Id.* (internal citations and quotations omitted). There are four narrow statutory bases for vacating an arbitration award. 9 U.S.C. §10(a). However, Gray only relies on the first, arguing that Kratos' "award was procured by corruption, fraud, or undue means . . . ." 9 U.S.C. §10(a)(1). The Eleventh Circuit has enumerated a three-part test to be used when reviewing an arbitration award for procurement by fraud:

> First, the movant must establish the fraud by clear and convincing evidence. Second, the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration. Third, the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration. This last element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred.

AO 72A
(Rev.8/82)

*Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (internal citations omitted).

Gray points to several parts of the arbitration award, which it contends are "directly contradicted by the record." For instance, Gray takes issue with the arbitrator's finding that GTS improperly terminated Kratos pursuant to the subcontract. Gray offers evidence in the form of email communications and deposition testimony to support its position that Kratos improperly installed parts of the alarm system and did not complete its work in a timely manner. Gray contends that this evidence shows that for Kratos to receive the arbitration award in its favor, Kratos must not have presented relevant evidence regarding the termination to the arbitrator and that omission is evidence of perjury and fraud.

In opposition, Kratos presents evidence that supports the conclusions of the arbitrator that Gray challenges. Gray's argument is essentially that Kratos should have presented evidence supporting GTS' case. Failure to present the opposing party's case for it, even where the opposing party is not present, is not fraud. *See Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 (D.C. N.J. 1976). As this court has already decided, Gray had the right to attend and defend GTS in the arbitration hearing, and it had notice of the hearing. It cannot be contended that Kratos somehow committed fraud by failing to offer evidence that would have helped GTS, and the court cannot vacate the arbitration award on that basis. As Gray has not shown fraud by

45

clear and convincing evidence, Gray's motion is DENIED [135]. Because the court denies Gray's motion to vacate on this ground, it need not address Kratos' additional arguments regarding standing and timeliness.

## V. Defendant Joseph Terry's Motion to Dismiss [162] and Defendants Aaron and Tammie Terry's Motion to Dismiss [167].

Joseph Terry is the president and owner of GTS. He is also a resident of Alabama. Aaron Terry is the Chief Executive Officer of GTS. Tammie Terry does not seem to be affiliated with GTS, but she is married to Aaron Terry. Tammie and Aaron Terry are residents of Texas. GTS is a Nevada corporation, with its principal place of business in Alabama. Gray is a Louisiana corporation with its principal place of business in Louisiana, but Gray is licensed to do business in Georgia. The Terrys and Gray executed an indemnity agreement in favor of Gray on January 6, 2005. The indemnity agreement was signed by the Terrys in their individual capacities. Gray requested the indemnity agreement before it would issue any of the bonds GTS needed to satisfy the Miller Act. Gray subsequently provided bonds for GTS regarding several government contracting projects, and the indemnity agreement does not address any project specifically. Gray has paid two claims arising out of the bond issued to cover the CDC project. It brought suit against the Terrys to enforce the indemnity agreement.

In a case such as this, where no evidentiary hearing is held, the plaintiff bears the burden of establishing "a prima facie case of personal jurisdiction over [the] nonresident

46

defendant." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). The plaintiff must present enough evidence to support a motion for directed verdict. *Id*. The court must accept as true the facts alleged by the plaintiff in its complaint, where such facts are not contradicted by the defendant's affidavits. *Id*. Where the plaintiff's complaint and affidavits and the defendant's affidavits conflict, all reasonable inferences must be construed in favor of the plaintiff. *Id*.

Both statutory and constitutional authority is necessary for a court to exercise jurisdiction over a nonresident defendant. *McGee v. Int'l Life Insur. Co.,* 355 U.S. 220 (1957). First, the court must determine whether the Terrys' alleged acts come within Georgia's Long Arm statute. *Madara*, 916 F.2d at 1515. If they do, the court still must assess whether jurisdiction is appropriate under the Due Process Clause of the Fourteenth Amendment. *Id*. Georgia's Long Arm statute provides jurisdiction over a nonresident defendant in several instances, but only one is relevant to this case.[19] There is jurisdiction

---

[19] O.C.G.A. § 9-10-91 also allows jurisdiction where a nonresident

> (2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;
>
> (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;
>
> (4) Owns, uses, or possesses any real property situated within this state; or

47

over a nonresident defendant where he "[t]ransacts any business" in the state of Georgia.

O.C.G.A. § 9-10-91(1). The Georgia Supreme Court recently held that § 9-10-91(1) "grants

Georgia courts the unlimited authority to exercise personal jurisdiction over a nonresident

who transacts any business in this State." *Innovative Clinical & Consulting Servs., LLC v.*

*First Nat'l Bank of Ames*, 279 Ga. 672, 675 (2005) (construing the statute to confer

jurisdiction to maximum degree allowed by procedural due process). Therefore, § 9-10-

91(1) is coterminous with the constitutional due process analysis.

Determining whether personal jurisdiction over a nonresident defendant accords with

due process requires consideration of two factors. *Madara*, 916 F.2d at 1515-16. The first

is whether the defendant has established "minimum contacts" with Georgia. *Borg-Warner*

*Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1996). If such

minimum contacts exist, the court decides whether the exercise of personal jurisdiction over

the defendant "would offend 'traditional notions of fair play and substantial justice.'" *Id*.

(citing *Intern'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)). The "nature and quality" of

the minimum contacts needed differs depending on whether the plaintiff is asserting specific

or general personal jurisdiction. *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291

---

(5) With respect to proceedings for alimony, child support, or division of property in connection with an action for divorce or with respect to an independent action for support of dependents, maintains a matrimonial domicile in this state at the time of the commencement of this action or, if the defendant resided in this state preceding the commencement of the action, whether cohabiting during that time or not. This paragraph shall not change the residency requirement for filing an action for divorce.

(11th Cir. 2000). Specific jurisdiction addresses situations where the defendant's contacts with the state are associated with the cause of action. *Helicopteros Nacionales de Colombia, N.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). General jurisdiction, on the other hand, can be exercised even where the nonresident's contacts with the forum state are unrelated to the underlying claim, as long as those contacts are of a sufficient quality.[20] *Id.* at 414 n.9.

---

[20] Gray has not stated whether it is asserting that this court has general or specific jurisdiction over the Terrys. However, the court will only address specific jurisdiction as neither party has addressed any contact with Georgia by the Terrys that does **not** arise from the CDC project and the indemnity agreement.

49

## A.    Joseph Terry

Gray filed a third-party complaint against Joseph Terry on May 28, 2009. In response, Joseph Terry brought the present motion to dismiss for lack of personal jurisdiction. Terry argues that because he is an Alabama resident, who is also president of a Nevada corporation, this court has no personal jurisdiction over him. In an affidavit included with his motion, Terry asserts that he has never transacted any business in Georgia nor has he ever visited the state of Georgia. On the other hand, Gray argues that Terry has substantial contact with Georgia for several reasons. First, Joseph Terry was in contact with people working on the CDC project in Georgia, he received paper work regarding the CDC project from Georgia, he signed the offer and award granting GTS the CDC contract, and he signed subcontracts with two subcontractors in the Atlanta area. Furthermore, Gray contends that the court has personal jurisdiction over Terry because he signed the indemnity agreement, and Gray later issued bonds regarding the Georgia-based CDC project. In reply, Terry argues that anything done in his official capacity as officer and owner of GTS cannot subject him to personal jurisdiction in his individual capacity. Terry also claims that the 2005 indemnity agreement does not mention the Georgia-based CDC project. Gray issued Terry multiple bonds for multiple projects under the agreement, including some that took place outside of Georgia. According to Terry, personal jurisdiction cannot be based on the indemnity agreement either.

AO 72A
(Rev.8/82)

To assert specific jurisdiction over a nonresident defendant, Gray must show that Terry has established such minimum contacts with the forum state that the exercise of personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *Borg-Warner Acceptance Corp.*, 786 F.2d at 1057. The minimum contacts analysis demands Gray demonstrate that Terry's contacts with Georgia are (1) related to the cause of action stated in the Gray's complaint; (2) the defendant has purposefully availed itself of the privileges of the forum; and (3) the defendant's contacts were of such a nature it should have "reasonably anticipat[ed] being haled into court there." *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627 (11th Cir. 1994) (internal quotations omitted).

The court must first address which of the contacts alleged by Gray can be considered contact by Terry with the state of Georgia. For the purposes of personal jurisdiction, Georgia courts have distinguished actions taken by a person in their capacity as an individual and actions taken in their capacity as a corporate representative. Actions taken on behalf of a corporate entity do not constitute personal contacts with the state of Georgia. *Southern Elecs. Distribs., Inc. v. Anderson*, 232 Ga. App. 648, 650 (1998); *Girard v. Weiss,* 160 Ga. App. 295, 297 (1981). The Eleventh Circuit has also held that under Georgia law "[a] nonresident individual cannot be subject to personal jurisdiction based solely upon acts in Georgia taken in his or her corporate capacity." *Club Car, Inc. v. Club Car (Quebec) Import,*

*Inc.*, 362 F.3d 775, 784 (11th Cir. 2004). Therefore, any action Joseph Terry took as a corporate official of GTS cannot give this court personal jurisdiction over him. The only remaining contact alleged by Gray is the fact that Terry signed the indemnity agreement, which made him personally liable on any bonds issued under it, including the bond issued for the CDC project in Georgia.

The indemnity agreement was signed in January of 2005, over eight months before GTS and the CDC entered into a contract. The indemnity agreement does not contain a Georgia choice of law clause,[21] and it does not give any indication that the agreement was made in contemplation of Gray issuing bonds for the Georgia-based CDC project. In fact, Gray issued bonds for several projects outside of Georgia during the months after the indemnity agreement was signed, including in Louisiana and Arkansas. D.E. [60], Ex. A, 5-9. Terry does not, however, deny that the indemnity agreement applies to the claims arising out of the CDC project.

Gray contends that *Drennen v. First Home Sav. Bank*, 204 Ga. App. 714 (1992) is instructive.[22] In *Drennen*, the plaintiff brought suit on two promissory notes against a company, the maker of the note, and six individual guarantors, all of whom were

---

[21] A Georgia choice of law clause would weigh in favor of a finding of jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481 (1985).

[22] Gray also cites several cases from other circuits and districts, none of which are persuasive or binding on this court.

nonresidents of Georgia. *Id*. at 714. The promissory notes were used to secure financing for construction of a motel in Georgia. *Id*. at 714-15. The individual defendants, all of whom were shareholders of the company, some of whom were officers and directors of the company, asserted a lack of personal jurisdiction. *Id*. at 714. The negotiations for the personal guaranties had taken place in Alabama and New Jersey, the contracts were signed in Alabama, and payments were made to New Jersey. *Id*. at 715. However, several of the individuals traveled to Georgia to visit the motel, and the personal guaranties were solely for the construction of the motel in Georgia. *Id*. The *Drennen* court found that there was jurisdiction based on the following reasons: (1) the personal guaranties were executed to induce the plaintiff to issue the promissory notes so that the proceeds of those notes could be used to build the Georgia hotel, which was to be managed by the maker of the notes, a Georgia corporation, (2) "the loans were secured by real property and fixtures located in Georgia," (3) the maker of the note was incorporated for the express purpose of building and running the hotel, and therefore "the parties undoubtedly intended for the loan payments to be made from the proceeds of the motel's Georgia operations," (4) the defendants traveled to Georgia periodically, and finally, (5) the guarantees contained a Georgia choice of law clause. *Drennen*, 204 Ga. App. At 716-17.

In the present case, Terry's connections to Georgia arising out of the indemnity agreement are much less extensive. There is no Georgia choice of law clause in the

indemnity agreement, and it was made well before GTS entered into the contract with the CDC. The agreement is not secured by any property located in the state, and Terry never traveled to Georgia in connection with the CDC project. Furthermore, the indemnity agreement says nothing about the CDC project, so the court cannot contemplate whether the parties intended a bond to be issued by Gray for the CDC project at the time the agreement was signed. That the indemnity agreement may cover the bond issued by Gray for the CDC project is not alone enough to confer personal jurisdiction over Terry. Terry's limited contacts with Georgia do not constitute purposeful availment, and therefore, exercising jurisdiction over Terry would not comport with due process. Defendant Joseph Terry's motion to dismiss for lack of personal jurisdiction is GRANTED [162]. The Clerk of the Court is DIRECTED to DISMISS WITHOUT PREJUDICE Joseph Terry.

### B. Aaron and Tammie Terry

Gray also filed a third party complaint against Aaron and Tammie Terry on May 28, 2009. In response, the Terrys brought the present motion to dismiss for lack of personal jurisdiction. The Terrys argue that as Texas residents who have never transacted business in Georgia or owned property in Georgia, this court has no personal jurisdiction over them. Both Aaron and Tammie Terry provided affidavits[23] asserting that neither has ever

---

[23] The affidavit Aaron Terry submitted with his motion to dismiss was not properly notarized. *See* D.E. [162], Ex. A. However, Mr. Terry offers a properly notarized version of the same affidavit. D.E. [176], Ex. A. He also offers an affidavit of the person who notarized his new affidavit. *Id.*

transacted any business in Georgia, maintained a place of business in Georgia, nor owned property or resided in Georgia. In turn, Gray argues that the Terrys' affidavits do not meet the standard necessary to shift the burden back to Gray. Gray further claims that the Terrys have substantial contact with Georgia for several reasons. First, Aaron Terry was involved in negotiating all aspects of the CDC contract, and he signed the bonds Gray issued for the CDC project. Gray also argues that Tammie Terry is subject to personal jurisdiction by this court because she is married to Aaron Terry, and therefore she has "a significant interest in any contracts that GTS has been able to obtain." D.E. [173], 4. Finally, Gray contends that by signing the indemnity agreement in their personal capacity, the Terrys conferred personal jurisdiction because they promised to indemnify Gray regarding any bonds issued for GTS, and Gray later issued bonds regarding the Georgia-based CDC project.

In reply, the Terrys argue that neither of them have the requisite minimum contacts. Tammie Terry's only alleged contact is the signing of the indemnity agreement and her relationship with her husband. The Terrys argue that the indemnity agreement cannot subject either of them to jurisdiction. The agreement does not refer to the CDC project, and there is no evidence that at the time the agreement was signed, the parties expected any issued bonds to cover a project in Georgia. Furthermore, the Terrys argue that Aaron Terry's actions taken on behalf of GTS cannot subject him, as an individual, to this state's personal jurisdiction. Consequently, if Aaron Terry's actions on behalf of GTS cannot subject him

55

to personal jurisdiction—his actions certainly cannot confer jurisdiction over his wife, Tammie Terry.

The arguments of both parties mirror those the court addressed when deciding whether it has personal jurisdiction over Joseph Terry, and the court's decision is the same. There is no personal jurisdiction over the Terrys because Aaron Terry's activities performed on behalf of GTS cannot alone form a basis for jurisdiction, and signing the indemnity agreement does not alone subject either Tammie or Aaron to personal jurisdiction in Georgia. Defendants Aaron and Tammie Terry's motion to dismiss for lack of personal jurisdiction is GRANTED [167]. The Clerk of the Court is DIRECTED to DISMISS WITHOUT PREJUDICE Aaron and Tammie Terry.

## VI.    Conclusion

Plaintiff Kratos Southeast Inc.'s motion for summary judgment is GRANTED IN PART and DENIED IN PART [113]. Defendant Gray Insurance Co.'s motion for summary judgment is DENIED [117], and Plaintiff Capital Computer Group, LLC's motion for summary judgment is GRANTED IN PART and DENIED IN PART [126]. Plaintiff Capital Computer Group, LLC's motion to strike or disregard is DENIED [130]. Defendant Gray Insurance Co.'s motion to vacate is DENIED [135]. Defendant Gray Insurance Co.'s motions to supplement are GRANTED [152] and [154]. Third-Party Defendant Joseph

Terry's motion to dismiss is GRANTED [162]. Third-Party Defendants Aaron and Tammie

Terry's motion to dismiss is GRANTED [167].


**IT IS SO ORDERED** this 24th day of March 2010.


_____/s   J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)